# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

| | | |
|---|---|---|
| **JOSEPH Z. MORKOS,** | ∫ | |
| | ∫ | |
| **Plaintiffs,** | ∫ | |
| | ∫ | |
| **v.** | ∫ | **Case No.** |
| | ∫ | |
| **DNV GL USA, INC.,** | ∫ | |
| | ∫ | |
| **Defendant.** | ∫ | |

## PLAINTIFF JOSEPH MORKOS' ORIGINAL COMPLAINT

Joseph Z. Morkos, Plaintiff, complains of DNV GL USA, Inc., Defendant, stating claims for relief as follows:

## 1.JURISDICTION AND VENUE

1.1   This is an action under the civil rights laws of the United States of America.

1.2   This Court respectfully is requested to exercise its supplemental jurisdiction over claims under laws of the State of Texas

1.3 Venue properly lies in the United States District Court for the Southern District of Texas, Houston Division, in which a substantial part of the events or

omissions giving rise to the claims occurred. The parties reside or do business within the Houston Division of the United States District Court for the Southern District of Texas.

## 2.

## NATURE OF THE ACTION AND THE RELIEF SOUGHT

2.1 Claims are presented in this action for unlawful discrimination in employment under the provisions of Title VII of the 1964 Civil Rights Act, as amended; the Civil Rights Act of 1866, to any extent necessary, and the statutory and common law of the State of Texas.

2.2 Upon the findings of the jury, the Court is requested to declare that the Plaintiff was unlawfully terminated and enter judgment providing for injunctive relief, including the restoration of Plaintiff to his rightful employment position, compensatory and punitive damages and costs of this action, including attorney's fees as an incident of such costs, and prejudgment and postjudgment interest as provided by law.

## 3.

## THE PARTIES

3.1 Plaintiff Joseph Z. Morkos (hereinafter "Morkos") is a male, adult citizen of the United States and the State of Texas, born in Egypt and immigrated to the

United States as an adult, who resides at 18210 Fairhope Oak Court, Houston, Harris County, Texas, and was an employee of the Defendant for more than 20 years, until his discharge on February 2, 2018.

3.2 DNV GL USA, Inc. (hereinafer "DNV") is a corporation, organized and registered under the laws of the State of Texas, engaged in business in commerce within the State of Texas as a subsidiary of DNV GL Holdings (USA), Inc., with its principal office located at 1400 Ravello Drive, Katy, Texas. Service of process may be had on DNV through CT Corporation System, 1999 Bryan St. - Suite 900, Dallas, Texas 78201.

**4.**

**MATERIAL FACTS**

4.1 Morkos, a 45-year-old Egyptian Copt, who by virtue of his ancestry, ethnic customs and characteristics is identifiable as being within a distinctive class or group, was subjected to intentional discrimination as such in the manner described in this action and is consequently entitled to protection under the terms of both the Civil Rights Act of 1866 and of 1964.

4.2 Morkos is licensed by the Texas State Board of Public Accountancy as a Certified Public Accountant, CPA.

4.3 He was hired as an accountant by DNV in November, 1997.

4.4 Despite discriminatory treatment, through competent and diligent work and skills, he advanced in his career with DNV, receiving high performance ratings, promotions, awards and certificates of achievement.

4.5 At the times material to this action, he was employed as Region Americas Finance Manager in the Sales Division of the DNV Software Business Area.

4.6 In that position, he had responsibility and authority for the hiring, training and supervision of subordinates in his department.

4.7 In October, 2017, following allegations of sexual harassment against a prominent film producer, there developed an international and highly publicized movement against sexual harassment, which came to be known as the "Me Too Movement," a name originated some 10 years before to promote assistance to women of color who had been subjected to sexual violence.

4.8 The name was popularized as a hashtag on social media and received considerable attention in the news media, particularly in New York Times articles in January and February 2018, which were widely noted and reproduced.

4.9 As a result of the widespread publicity, complaints of sexual harassment, the number of which had been decreasing for years, greatly increased in late 2017 and early 2018.

4.10 In late 2016 and early 2017, Morkos supervised three females in his department, Anabel Vieira, Diana Scott and Brenda Viera.

4.11 Ms. Vieira was employed by DNV in September 2014 and had reported to Morkos since March 2015.

4.12 Ms. Scott was hired by DNV as a temporary employee in July 2016, and Morkos had converted her status to permanent in January 2017.

4.13 Ms. Viera was hired by DNV as a temporary employee in September 2016, and Morkos converted her status to permanent in March 2017.

4.14 Additionally, Morkos supervised another female, Jeana Kloewer, known as Alex, who works in a DNV office in Corvallis, Oregon.

4.15 In May, 2016, Morkos traveled to Corvallis and Mechanicsburg, Pennsylvania on DNV business and was accompanied by Ms. Vieira and Ms. Kloewer.

4.16 Upon information and belief, Morkos asserts that in the latter part of February 2017, Ms. Vieira contacted Denisa Ballard, DNV Regional Manager of Human Resources to complain about her working relationship with Morkos.

4.17 Further upon information and belief, Morkos asserts that subsequently Ms. Scott and Ms. Viera complained to Ms. Ballard about Morkos' management style and practices.

4.18 On March 1, 2017, Morkos discussed with Ms. Vieira the progress of her assigned work on a project, and Morkos noted that Ms. Vieira responded rudely and negatively.

4.19 At the time, Morkos was unaware of the complaints made about him to Ms. Ballard.

4.20 Concerned about Ms. Vieira's attitude, Morkos telephoned Anita Kovacs, DNV Divisional Finance Manager and his supervisor to report the incident and inform Ms. Kovacs, who had ultimate responsibility for the project, that a project deadline of March 31, 2017, likely would not be met.

4.21 While on the telephone to Ms. Kovacs, Morkos noticed that Ms. Ballard was leaving her office accompanied by Ms. Vieira.

4.22 When Morkos saw Ms. Ballard return to her office after about 30 minutes, Morkos contacted Ms. Ballard and inquired about any discussion between Ms. Ballard and Ms. Vieira.

4.23 When Ms. Ballard inquired why Morkos was asking about Ms. Vieira, Morkos described to Ms. Ballard his problem earlier that morning with Ms. Vieira.

4.24 Ms. Ballard responded to the information about Ms. Vieira by telling Morkos to not roughen any feathers and that they would discuss the matter the following week.

4.25 Morkos noticed that throughout the entire day, Ms. Vieira, Ms. Scott and Ms. Viera were conferring with each other.

4.26 Morkos mentioned the unusual behavior to Ms. Ballard, and Ms. Ballard responded angrily and told Morkos not to speculate about the matter.

4.27 Upon information and belief, Morkos asserts that at that time Ms. Ballard had received the complaints against Morkos and communicated them to Michael McCaffrey, DNV Global Shared Services Manager of Human Resources.

4.28 The following day, March 2, 2017, as soon as Mr. Morkos arrived at work, he was summoned to meet with Mr. McCaffrey.

4.29 Morkos was told that the previous day Ms. Ballard had brought to him complaints about Morkos from Anabel Vieira, and that later in the day Ms. Ballard had received complaints from Morkos' entire staff.

4.30 Mr. McCaffrey told Morkos that "entire staff" included Ms. Kloewer in the Corvallis office.

4.31 Ms. Kloewer later informed Morkos and Ms. Kovacs that Ms. Vieira, Ms. Scott and Ms. Viera had contacted Ms. Kloewer and asked that she join in their complaints and that Ms. Kloewer refused and believed the complaints were unfair.

4.32 Mr. McCaffrey conducted an extensive interview of Morkos, handed Morkos a copy of the DNV harassment policy, did not provide any specific

information of the nature and source of the complaints and demanded that Morkos

provide his company telephone and laptop computer for a forensic examination.

4.33 Morkos' interview by Mr. McCaffrey continued the following day, during

which Morkos responded to additional questions and presented evidence of his

working relationship with his subordinates.

4.34 During the second interview, Mr. McCaffrey chastised Mokros for having

discussed the complaint with Ms. Ballard.

4.35 On March 7, 2017, Mr. McCaffrey had a third meeting with Morkos, at

which Mr. McCaffrey stated that the evidence in his investigation was conflicting and

he was having difficulty determining the facts.

4.36 At the third meeting, Mr. McCaffrey informed Morkos that Mr.

McCaffrey would discuss his findings with Ms. Kovacs, Morkos' supervisor, and

Morkos would be informed of any action to be taken.

4.37  On March 15, 2017, Morkos, Ms. Kovacs and Terry Ivarsson, assistant

to Mr. McCaffrey, participated in a telephone conference in which Ms. Kovacs

discussed the determination that had been reached, which was to issue a written

warning to Morkos.

4.38 The written warning stated that Morkos had told jokes at work and had

hugged and kissed a female subordinate in an elevator, which DNV found could be

interpreted at harassment under the company's policy and were interpreted as such by the individuals concerned.

4.39 Morkos was told by Ms. Kovacs, his supervisor, that she was confident that he had not engaged in any misconduct, but that she believed that the manner in which the investigation was being handled indicated to her that it was intended to punish Morkos and that it would be preferable for Morkos to have it end by not opposing the written admonishment.

4.40 Morkos agreed to acknowledge the warning by his signature in order to end what had been a personally humiliating and distressing experience, while repeating his assurance that he had not intended any harassment and regretted and apologized for anything that had been perceived as such.

4.41 Hugging and kissing on the cheek or forehead is common and accepted by Egyptians as a cordial greeting and expression of friendship, as DNV knows or should have known, since its parent company maintains offices in Cairo and Alexandria, Egypt.

4.42 In finding that Morkos' conduct might be interpreted as harassment, DNV wholly ignored that no objection or protest about his conduct had been expressed to Morkos during his 20 years of working with and supervising women, including those who had presented the complaint without his knowledge.

4.43 DNV took adverse action against Morkos because of Morkos' cultural, ethnic practice of hugging and kissing, choosing to interpret it as motivated by sexual desire or interest rather than as an intended sign of appreciation and respect.

4.44  As supervisor of the three female subordinates who complained, Morkos had the authority and responsibiity to assign, direct and evaluate their assignments and performance.

4.45 Shortly before he was informed of the complaint, Morkos had a serious discussion with Ms. Vieira regarding her apparent delay on an assigned project, which had required Morkos to inform his supervisor that the project would not be completed at the time scheduled.

4.46 Shortly before he was informed of the complaint, Morkos had noticed and become concerned about Ms. Vieira unusually spending more time in private conferences with Ms. Viera and Ms. Scott.

4.47 Morkos had reported the unusual activity to Ms. Ballard prior to his being informed of the complaint.

4.48 Upon information and belief, Morkos avers that at the time that he informed Ms. Ballard of the unusual activity of the complaining subordinates, Ms. Ballard already had been informed of the complaint, but did not mention it to Morkos and did not provide him an opportunity to address it informally.

4.49 DNV received and investigated the sexual harassment complaint against Morkos in a manner that arbitrarily favored the female complainants and unfairly and discriminatorily resulted in adverse action against Morkos.

4.50 The disparate treatment against Morkos was knowingly and intentionally imposed against Morkos, to his substantial damage, in an effort by DNV to avoid criticism and notoriety such as that to which other large business enterprises were exposed.

4.51 The manner in which the complaint was handled caused severe emotional distress to Morkos, which required medical attention and prescribed medication for anxiety and sleeplessness.

4.52 Action by DNV did not end with Morkos' acceptance of the written warning, as Morkos had expected.

4.53 Ms. Ballard informed Morkos' first and second line supervisors that she would conduct for Morkos and his staff what Ms. Ballard characterized as a friendly workshop.

4.54 A meeting was scheduled, which Ms. Ballard told Morkos would be casual and in a friendly atmosphere.

4.55 Morkos, Ms. Viera, Ms. Scott and Ms. Ballard attended in person, and Ms. Kloewer participated through a Skype connection.

4.56 Ms. Ballard began the meeting by describing it as a "Manager Immersion Exercise," at which the three women subordinates would meet privately with Ms. Ballard to express their concern.   She said that thereafter Morkos would be called in an informed of their input in their presence, and Morkos would then be given an opportunity to respond.

4.57 Morkos left the room, and when he was asked to return he was presented with a list of criticism of his management and a repetition of what had been raised in the complaint that Morkos believed had been resolved.

4.58 Morkos was told that on the next day he could provide his response to the group.

4.59 After the meeting, Morkos approached Ms. Ballard at her office to express that what had been described to him as a friendly workshop to clear the air had resulted in a repetition of the complaint and criticism of him by his staff and even by Ms. Ballard herself.

4.60 Ms. Ballard reacted angrily and berated Morkos in a loud voice, claiming he was feigning emotional distress and saying that he should discontinue taking his prescribed medication

4.61 Morkos was so distressed he had to take leave from work the following day.

4.62 Morkos contacted Ms. Kovacs to let her know that he would not be at work the following day.

4.63  Ms. Kovacs informed Morkos that she had not received any information from Ms. Ballard about the "immersion exercise," and Morkos sent Ms. Kovacs a copy of what had been given to him.

4.64 The following day, Ms. Kovacs called Morkos to tell him that Ms. Kovacs had spoken with Ms. Ballard and expressed concern that the exercise did not appear to be impartial.

4.65 Ms.Kovacs advised Morkos to prepare his response in writing and try to remain calm because it seemed to her that it did not appear that Morkos would be treated fairly.

4.66 When Morkos returned to work and met to provide his response, the reaction from his staff was rude and angry.

4.67 Ms. Ballard, rather than attempting to bring the discussion into a less adversarial tone, sided with the females, to the extent of informing them that thereafter they did not have to be concerned with Morkos' authority and direction and did not have to inform him about their arriving and leaving work or taking extended lunches.

4.68 When Morkos returned to his office, he received a call from Ms. Kloewer, who stated that she had been contacted by Ms. Vieria, Ms. Viera and Ms. Scott and asked to join in their complaint, but that she had refused and had nothing to do with the complaint.

4.69 Ms. Kloewer said that she had not wanted to participate in the "immerson exercise," but that Ms. Ballard had pressed her to attend and indicated that her attendance was required.

4.70 One week following the final meeting of the "immersion exercise," Ms. Kovacs contacted Morkos and informed him that Ms. Ballard had submitted to her a proposed "Individual Development Plan" to improve Morkos' management skills.

4.71 Ms. Kovacs indicated that she was not pleased that Ms. Ballard had initiated the proposed plan and proposed that either Ms. Kovacs or Ms. Ballard could discuss it with Morkos.

4.72 The discussion between Morkos and his supervisor, Ms. Kovacs, occurred on March 30, 2017, and Ms. Kovacs commented she was tired of what she consider a badly handled matter and suggested that they schedule a conference at the end of April.

4.73 After the immersion exercise, Morkos' staff ignored DNV policies and Morkos' authority, arrived late to work, took extended lunches and left the work area

for extended periods of time. Ms. Ballard, who had explicitly authorized them to disregard his supervision, would not assist and was rude when he sought her involvement.

4.74 Morkos' emotional state degraded into depression. On or about April 21, 2017, Morkos arrived at work with severe chest pain and approached Ms. Ballard, who in addition to her human resources duties was the designated health, safety and environment manager.

4.75 Ms. Ballard did not offer Morkos assistance, but yelled at him to leave her office.

4.76 Morkos left work at mid-day and sought medical attention. A nurse at his physician's office referred him to a psychotherapist.

4.77 After a consultation with a psychologist on April 26, 2017, regarding medication, Morkos began treatment with the psychotherapist on April 29, 2017.

4.78 On April 28, 2017, his condition became so serious that he was rushed to a hospital emergency room.

4.79 Morkos took short term disability leave from his DNV employment in order to undergo intensive psychotherapy and medication for his condition. The leave lasted from April to July, 2017.

4.80 Upon his return to DNV on July 25, 2017, Morkos objected to the proposed individual development plan, citing his recognized excellent performance as a 20-year employee and manager with no prior disciplinary action or management complaints.

4.81 In an effort to obatain relief from his continuing precarious emotional state, Morkos sought a review of the complaint process and the management immerson exercise, with particular attention to Ms. Ballard's improper and biased involvement.

4.82 A lengthy communication from Morkos to Ms. Kovacs requesting the review was referred by Ms. Kovacs to Tore Selso, Director of Global Software Sales for the DNV corporate parent in Norway.

4.83 On September 6, 2017, Morkos had a lengthy Skype conference with Mr. Selso, and on September 8, 2017, Mr. Selso informed Morkos that Inger-Marie Sannerud, Global Human Resources Director of the parent corporation, was opening an inquiry into Morkos' request.

4.84 In mid-September, Morkos attended a conference of DNV finance managers in Poland and took the opportunity to travel to the DNV GL global corporate headquarters to attempt a detailed discussion with Mr. Selso and Ms. Sannerud.

4.85 Mr. Selso and Ms. Sannerud told Morkos that they had only limited time to meet with him, and in a short conference suggested to Morkos that he put the matter behind him and move on, stating that Morkos had not been fired or demoted and there was no need for further consideration.

4.86 DNV's refusal to give Morkos serious consideration exacerbated his depression and medical condition, requiring medical attention in his Norway hotel.

4.87 Upon his return to the United States, Morkos was required to take disability leave and not return to work until he was cleared for return by his physician.

4.88 In December, 2017, Morkos was released by his treating physician to return to work, but he was denied reinstatement by DNV.

4.89 While Morkos was on leave, he was notified by DNV that the company was restructuring and that he had to reapply for his position.

4.90 Morkos submitted an application for his position and informed DNV that he was prepared to return to work.

4.91 On February 2, 2018, Morkos was informed that because he had not been selected for his position, his employment with DNV was terminated.

4.92 Morkos was the only individual in his organization to be terminated as a result of the purported restructuring.

4.93 Morkos position was filled by an individual with clearly lesser qualifications and significantly less time of service.

4.94 At or about the time that Morkos was terminated, DNV had available a financial position for which Morkos was fully qualified and for which DNV advertised for applicants.

4.95 Morkos has made diligent efforts to find a position equivalent to that from which he was terminated, but has not found similar employment as that held with DNV.

4.96 As a proximate result of the acts and omissions of DNV through its offiials and agents, Morkos has been damaged by loss of pay and benefits in the past, loss of pay and benefits in the future, damage to his personal reputation, damage to his professional reputation, severe emotional and physical distress, and loss of the enjoyment of life.

4.97 It was necessary for Morkos to obtain the services of lawyers with respect to his claims, together with related costs, and as part of his relief Morkos is entitled by law to recover from DNV the costs of this action, including reasonable attorneys' fees as an incident of such costs.

4.98 DNV acted intentionally, recklessly or maliciously, and Morkos should recover punitive or exemplary damages as part of his relief, in addition to the damages above set forth.

## 5.

## Claims for Relief

5.1 But for intentional discrimination against him because of his sex, race and national origin, Morkos would not have been unjustly punished and discharged, and Morkos makes claims for damages and injunctive relief under Title VII of the 1964 Civil Rights Act as amended.

5.2 With respect to punitive or exemplary damages and any other monetary or injunctive relief that is not covered by Title VII, Morkos makes claim for damages and injunctive relief under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and related laws.

5.3 Morkos makes claims under the common law and statutes of the State of Texas to the extent it might be necessary to provide him full relief.

## PRAYER

Morkos prays that this action be set for trial at the earliest time available to the Court and that upon the evidence presented and the verdict of the jury, the Court issue

mandatory and prohibitory injunctive relief requiring Morks to be restored to his rightful position of employment by DNV, include in its judgment that DNV pay to Morkos monetary damages in the amount determined by the jury, determine and award to Morkos reasonable attorneys' fees and related costs, together with prejudgment and postjudgment interest as provided by law, as well as any other relief to which Morkos shows he is entitled.

Respectfully submitted,

/S David T. López

_____
David T. Lopez
Attorney for Joseph Z. Morkos
S.D. Texas No. 8467
State Bar of Texas No. 12563000
3900 Montrose Boulevard
Houston, TX 77006-4959
Telephone: 713-523-3900
Telecopier: 713-523-3908
E-mail: dtlopez@lopezlawfirm.com

OF COUNSEL:

DAVID T. LOPEZ & ASSOC.

## **DEMAND FOR JURY**

Morkos requests that all issues of fact in this action be determined by a jury, as provided by the Constitution of the United States of America.